**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRANDON JOHNSON | Case No. 20-CR-926<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

On December 22, 2020, the grand jury indicted Defendant Brandon Johnson for unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1). *See* [6]. On October 14, 2022, Defendant moved to suppress the gun seized from him at the time of the arrest that led to the indictment. *See* [46]. This Court held an evidentiary hearing on Defendant's motion on July 18, 2023 and September 22, 2023.

Based upon this record, which includes the materials submitted by the parties, the evidence presented at the hearing, and the parties' stipulations and written and oral arguments, the Court denied the motion from the bench and via minute entry on June 6, 2024, indicating that a written ruling would follow. *See* [78].[1] This ruling constitutes the Court's findings of fact and conclusions of law.

---

[1] Based upon the in-court proceedings, this Court makes the factual finding that the law enforcement officers all testified credibly. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018) (Generally, the trial court's credibility determinations are entitled to deference "because, unlike our review of transcripts, the district court 'had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing.'") (quoting *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) and *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006)).

1

I. **Findings of Fact**

On January 25, 2020, at approximately 5:14 p.m., Deandrea Dixon placed a 911 call to report that her sister's intoxicated boyfriend had brandished a gun and threatened to shoot her. [59] ¶ 1. Deandrea provided her sister's name and address and informed officers there were six or seven other people in the residence, most of them children. *Id.*

At approximately 5:25 p.m., Chicago police officers arrived at Deandrea's residence where Deandrea told officers that she got into a verbal dispute with Brandon Johnson, her sister's boyfriend, and that Johnson then pulled out a black handgun and told Deandrea, "I'll shoot you if you ever thought about stabbing me." *Id.* ¶ 3. Deandrea provided officers with her sister, Dominique Dixon's, address and described Johnson's appearance. *Id.*

At approximately 5:45 p.m., officers arrived at Dominique's residence. *Id.* ¶ 4. Three officers approached her front door while two additional officers waited on the sidewalk. *Id.* Dominique opened the front door, and, at an officer's request, turned on the lights in the residence. *Id.* One officer asked for her address, and a second officer asked if her house number was "55." *Id.* The first officer then asked Dominique if she had been painting because she had paint on her arm. *Id.* Dominique responded "yeah" to the officers' questions. *Id.* The first officer then asked, "Can I see," and the second officer asked, "Can we come inside?" Dominique again responded, "Yeah." *Id.* Dominique backed away from her front door to allow

2

the officers to enter. *Id.* The entire interaction between Dominique answering the door and the officers entering her residence lasted approximately fourteen seconds. *Id.*

One officer asked Dominique who else was present in the residence, and she stated, "I got my, uh, friend and the kids upstairs. We painting." *Id.* ¶ 5. Dominique asked if the officers wanted to go upstairs, and one officer asked, "yeah, can we talk to them?" *Id.* Dominique responded, "yeah" and raised her right arm toward the staircase to the second floor. *Id.* Dominique and two officers ascended the staircase, and the other officers stayed on the first floor and proceeded down the hallway to a back room. *Id.* ¶ 6.

Once the officers and Dominique arrived upstairs, the officers encountered several children. *Id.* ¶ 7. One officer asked her where her "friend" was, stating "I thought you said he was up here." *Id.* Dominique responded, "No. Downstairs." *Id.* The officer asked, "Wait, you said the guy was up here or downstairs?" Dominique responded, "I have two friends down there, but he's gone." *Id.*

Officer Vargas (who testified at the September 22, 2023 suppression hearing and whose testimony the Court has found credible) stated that, as other officers walked upstairs with Dominique, he moved to the back room where he immediately saw two individuals, one of whom matched the description provided by Deandrea. When asked why he proceeded to the back room, Officer Vargas explained, based upon his training and experience, and based upon the threatening nature of the call,

3

including the fact that the suspect allegedly brandished a firearm, he needed to conduct a routine protective sweep for the safety of everyone on scene.

Officer Vargas testified that when he entered the back room, he asked both individuals to keep their hands out and instructed the first individual, who the officers later identified as Pernell Hill, to come forward. Officer Vargas frisked Hill to ensure he did not possess any weapons.

After patting down Hill, Officer Vargas sent him out of the room to be temporarily detained by another officer. *Id.* ¶ 10. He then asked Johnson to come forward and proceeded to perform a protective frisk of Johnson's waistline and pockets. During the frisk, Officer Vargas testified that he felt a bulge that produced a crinkling noise, which, based upon his training and experience, he determined to be some type of narcotics, likely cannabis. Johnson's voluntary admission that he had smoked weed earlier bolstered this conclusion.

After frisking Johnson's waistline and pockets, Officer Vargas asked Johnson if he had any contraband, and Johnson said that he did not. Johnson stated that he had been smoking weed and that the residence belonged to his girlfriend. Officer Vargas testified that he then asked Johnson to move to the other side of the room. As he did so, Johnson picked up a phone from the couch, which the officer told him to leave on the couch, but Johnson did not comply with the instruction. *Id.* ¶ 11.

Officer Vargas testified that, due to the nature of the call and the information that Johnson possessed a firearm, he wanted to keep Johnson away from the area

where he was sitting, in case Johnson had concealed the firearm there. After questioning Johnson, Officer Vargas again felt Johnson's pocket where he had previously felt the bulge to ensure he did not miss a hard object. He did not perform another full frisk of Johnson; he only double checked the pocket where he initially felt the bulge. After Officer Vargas frisked the pocket again, Johnson told the officers that his name was Brandon Jones and stated that he did not have an argument earlier that day. He also stated that he lived at the residence and that Dominique was, in fact, his girlfriend. He denied having a firearm but admitted that he was "so high" and "intoxicated." *Id.* ¶ 12.

When Dominique entered the back room, Johnson asked her, "What's going on, baby?" and Dominique responded that the officers said they received a call. *Id.* ¶ 13. The officer told Johnson that a woman claimed that Johnson had "pulled a pistol on her." *Id.* One of the officers asked Johnson who the other woman was, but Johnson said he did not know. *Id.* When the officer pressed Johnson, Johnson then admitted, "we got into it, we got into it, we did, we did, we did. We got into it." *Id.* ¶ 14.

After the voluntary admissions and inconsistent statement, one of the officers temporarily secured Johnson with handcuffs and began a search of the immediate back-room area for the firearm. *Id.* ¶ 15. The officers also asked Dominique, Johnson, and Hill about the alleged altercation. *Id.* ¶ 16. Officer Riordan (who testified at the September 23, 2023 hearing and whose testimony the Court has

5

found credible) stated that Johnson's inconsistencies gave credence to Deandrea's complaint and indicated to him, based upon his training and experience, that Johnson was concealing important incriminating details of the incident. Based upon the totality of circumstances, including the various statements by Johnson, Officer Riordan credited the victim's complaint and believed that Johnson had threatened the victim and possessed the firearm.

As officers searched the back room, a sergeant entered the room and asked officers standing near Johnson if Johnson had already been frisked. *Id.* ¶ 21. Before receiving an answer, he began patting all the way down Johnson's pants leg, and a firearm fell to the ground. *Id.* The officers then took Johnson into custody. The officers' entire interaction with Johnson lasted less than fifteen minutes. *Id.* ¶ 22.

While certain officers stayed at Domnique's residence, a different group of officers had walked back to Deandrea's home to question her. *Id.* ¶ 19. At that time, Deandrea reaffirmed her complaint, and told the officers that her nephew (who was at Dominique's home) confirmed that Brandon Johnson was in possession of the firearm; that Johnson was Dominique's boyfriend; and that Deandrea went to Dominique's to ask Johnson to leave. *Id.* Johnson, who was intoxicated, then pulled a gun on Deandrea and threatened to shoot her. *Id.* Deandrea told officers she wanted to press charges and would sign a complaint, which she ultimately did. *Id.*

## II. Conclusions of Law

Defendant does not challenge the officers' entry into Dominique's residence,

6

but rather argues that she only gave the officers limited consent to enter and speak with individuals on the second floor, not the first floor. Defendant also argues that the officers frisked him a total of three times but did not have reasonable suspicion sufficient to justify anything beyond the first frisk and that the officers unreasonably prolonged his detention. The Court addresses each argument, in turn, below.

### A. Scope of Consent

The parties agree that the officers had Dominique's consent to enter her residence after they asked, "Can I see?" and "Can we come inside?" and she responded, "yeah" and moved out of the doorway to let officers enter. But Defendant argues that, once the officers asked to speak to the individuals upstairs, Dominique supposedly limited that consent to the second floor of the home when she said "yeah" and gestured to the staircase.[2] Defendant argues therefore that the officers exceeded the scope of consent when they proceeded to the back room of the first floor where they found Johnson.

When an individual consents to a search by law enforcement, the search "is reasonable under the Fourth Amendment so long as it remains within the scope of consent." *United States v. Jackson*, 598 F.3d 340, 348 (7th Cir. 2010) (citing *Michael C. v. Gresbach*, 526 F.3d 1008, 1015 (7th Cir. 2008)). The scope of consent is "limited

---

[2] Specifically, the facts show: (1) Dominique said "I got my, uh, friend and the kids upstairs. We painting" and asked if the officers wanted to go upstairs; and then (2) after an officer asked, "yeah, can we talk to them?" Dominique responded, "yeah" raising her right arm toward the staircase to the second floor. As a factual matter, this Court finds that Dominique attempted to misdirect the officers when she indicated her friend was upstairs because she knew Johnson was in the backroom, but this deception fails to constitute an express limitation on the consent she gave the officers.

7

by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *Id.* (quoting *Gresbach*, 526 F.3d at 1015). Courts apply an objective reasonableness standard to scope of consent questions, asking what "the typical reasonable person would have understood by the exchange between the law enforcement agent and the person who gives consent." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)).

In this case, Dominique voluntarily permitted the officers to "enter" and "see" in her residence. *Id.* ¶ 4. When the officers asked who else was in the house, Dominique responded that her "friend" and her children were upstairs. [46-5] at 23:46:24–23:46:30. An officer asked to speak to "them" (i.e., her friend and children), and Dominique responded, "yeah." *Id.* at 23:46:31–23:46:35.

Based upon the factual record, including the officers' body camera footage, Dominique expressed her consent for the officers to, not only enter her residence, but also to see and speak to others in the house. Dominique did not limit her initial general consent to see and enter her residence in any way. Likewise, she never told the officers they could only look upstairs and speak to the individuals upstairs, nor did she take any other action to indicate any refusal as to the officers speaking to individuals on the first floor. *Id.*

While the "scope of a search is generally defined by its express object," an individual "may 'delimit as he chooses the scope of the search to which he consents.'"

8

*Jackson*, 598 F.3d at 348 (quoting *Jimeno*, 500 U.S. at 251). After obtaining a general consent to see and enter the residence, the officers specifically asked Dominique to speak to her friend (Johnson) and her children, and she expressly consented. Considering the totality of the circumstances, a reasonable person would believe such consent extended to speaking with her friend who was present on the first floor of the residence.

Defendant argues that Dominique blocked the hallway leading to the back room, impliedly prohibiting the officers from proceeding down the hallway to the back room and ostensibly limiting the scope of her consent. But the body camera footage undermines this assertion, and this Court finds as a factual matter that Dominique merely stepped back into the hallway when officers began to move upstairs to let them pass her and access the staircase. [46-5] at 23:46:31–23:46:39. Dominique's subsequent actions bolster this Court's finding: she does not wait for all officers to proceed upstairs, but rather permits an officer to pass and then follows him upstairs, leaving the remaining officers downstairs, behind her. *Id.* Her behavior in no way manifests an intent to limit her consent for the officers to only search upstairs.

Dominique's calm response to the officers' presence in the back room further undermines Defendant's argument that Dominique limited her consent to the second floor only. The Court may consider, as one factor in its analysis of the totality of the circumstances, an individual's "subsequent silence and acquiescence" to the

9

presence of law enforcement. *Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988). After the officers realized Johnson was not on the second floor, they proceeded to the back room where other officers had already begun questioning him. Dominique also arrived at the back room and gave no indication that she was surprised to find officers there or that she had any objection to their presence, or otherwise intended to deny officers access to the area. [46-3] at 23:48:15–28:49:03.

Because Dominique consented to the officers' entry into her residence and gave her consent for them to see and speak with the other individuals in the home, the Court finds that the scope of her consent included the officers' proceeding to the rear of the apartment to speak with Johnson and Hill in the back room.

Moreover, even if Dominique *had* limited her consent to speak to the individuals on the second floor (which the factual record does not support), the officers nonetheless had the right to perform a protective sweep of the residence to ensure their safety and the safety of everyone on scene. As the Seventh Circuit has held, when "officers enter the residence of a criminal suspect and have reason to believe that a particular area might harbor" an individual "who poses a danger to the officers or others, the Fourth Amendment permits a quick and limited protective sweep." *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013).

In this case, the officers received information from Deandrea that Johnson remained in the apartment, that he had a gun, and that he had brandished the gun and threatened to shoot her. Based upon the body camera footage, which reveals

10

lights and loud music emanating from the back room, officers reasonably discerned the presence of additional occupants in that area of the apartment. [46-5] at 23:46:30–23:46:47. This information, combined with the knowledge that Deandrea called 911 to report Johnson's threatened used of a firearm, provided the officers grounds to proceed to the back room of the residence to perform a protective sweep. *See United States v. Contreras*, 820 F.3d 255, 268 (7th Cir. 2016) ("Having heard the presence of another person, the police were entitled to sweep the house for their own protection.").

### B.     Johnson's Second Frisk

At the suppression hearing, Defendant conceded that he does not challenge his initial frisk but argues that officers did not have reasonable suspicion sufficient to justify a second or third frisk. According to Defendant, Officer Vargas performed two separate frisks of his person: Vargas performed an initial frisk of Johnson, then frisked Johnson again after moving him off the couch and across the room.

But, the Seventh Circuit has held that an officer may pause a *Terry* frisk and resume the frisk following an interruption:

> The proper way to view this encounter with the police, we conclude, is as a single event, not two or three different stages. Pulver was not finished with his *Terry* frisk at the time he turned to the car; that is why he did not leave Robinson free to go, but instead turned over the job of watching Robinson to Franceus. As the timeline above shows, only a minute or so elapsed between when Pulver interrupted his pat-down of Robinson to take another look at the car and when Pulver resumed the frisk.

*United States v. Robinson*, 615 F.3d 804, 808 (7th Cir. 2010).

11

As in *Robinson*, Vargas' "second" frisk constituted a continuation of his first frisk. The same officer who performed the first frisk paused, moved Defendant to one side of the room due to legitimate safety concerns, took possession of Defendant's cell phone (after he refused instructions), asked Johnson about the firearm, and then finished frisking him. Like the officer in *Robinson*, Officer Vargas attended Johnson throughout this process, and less than sixty seconds elapsed between the beginning and end of the frisk. *See* [46-5] at 23:47:08–23:47-35. Thus, because officers had reasonable suspicion to perform a *Terry* frisk of Johnson, Officer Vargas' continuation of that frisk after relocating Defendant did not violate his Fourth Amendment rights.

    **C.**    **Johnson's Final Frisk**

Defendant also contests the constitutionality of a third frisk performed by another officer after the initial frisk did not produce the firearm.

Officers may frisk an individual if they have "a reasonable belief that the person was armed and dangerous." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Further, "it is not necessarily unreasonable for police to frisk a person more than once when he has been seized on the rapidly evolving scene of police activity." *Id.* The Court must determine whether "the frisk was reasonable on the facts known to the officer at the relevant moment." *Id.*; *United States v. Smith*, 32 F.4th 638, 642 (7th Cir. 2022) (second frisk appropriate because defendant's actions and his nervous appearance allowed the

12

officer to "reasonably infer that Smith was hiding a weapon in his pants."). So too here.

After Officer Vargas completed the initial (but incomplete) pat down of Johnson, officers continued questioning him regarding the incident, asking him whether he possessed a firearm and whether he had argued with a woman at the residence. Officer Riordan testified that, during questioning, Johnson told officers his name was Brandon Jones, which was suspiciously close to the name Deandrea had reported, Brandon Johnson.

Officer Riordan testified that, based upon his training and experience, an individual may attempt to obstruct his identification to limit officers' knowledge of his relationship with a victim or prevent them from learning about his criminal background. Further, Officer Riordan testified that Johnson initially denied getting into an argument with the woman, but after further questioning, he ultimately admitted he engaged in a verbal altercation with her. Based upon his training and experience, Officer Riordan found these inconsistencies suspicious and bolstered the credibility of Deandrea's statements.

Following these misleading and inconsistent answers from Johnson, the officers' sergeant arrived on the scene and performed another pat down of Johnson. The sergeant asked the officers standing near Johnson if someone had already frisked him, but he began patting down Johnson's left leg before the officers could fully answer; that is when a pistol fell out of Johnson's pants.

13

The evolving circumstances of the police activity, including Johnson's evasive answers to officers' subsequent questioning, in conjunction with the details of Deandrea's report, provide reasonable suspicion sufficient to justify the final frisk. Johnson admitted he was high and intoxicated, attempted to hide his real identity and, despite initially denying involvement in any argument, ultimately admitted he had a disagreement with the woman. Based upon Johnson's conduct, including his changing story, and the corroboration his statements gave to Deandrea's complaint, a reasonable officer could conclude that Johnson possessed a weapon and was concealing it on his person, providing reasonable suspicion for a second frisk.[3] Further, as in *Smith*, the second frisk was "tailored to the situation and minimally invasive," where the frisking sergeant began by patting down Johnson's pants leg. 32 F.4th at 642.

D.    **Length of Johnson's Detention**

Defendant also argues that the officers unreasonably prolonged his detention when they failed to find a firearm after the first frisk. A *Terry* stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). To determine the reasonableness of the duration

---

[3] Even if the sergeant who performed the frisk did not personally know the details regarding Johson's suspicious conduct and responses, information obtained by other officers working in concert supports reasonable suspicion under the collective knowledge doctrine. *See United States v. Eymann*, 962 F.3d 273, 283–84 (7th Cir. 2020) (Under the collective-knowledge doctrine, "where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all.") (citing *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)).

14

of a stop, the courts will consider "the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 685–87 (1985)). Further, "a defendant's actions can contribute to a permissible extension of a stop," including when a defendant gives problematic responses to lawful questions that "increased rather than allayed the officers' suspicions." *United States v. Ruiz*, 785 F.3d 1134, 1143 (7th Cir. 2015).

The officers in this case diligently pursued their investigation to "confirm or dispel their suspicions quickly." *United States v. Reedy*, 989 F.3d 548, 553 (7th Cir. 2021). The officers arrived at Dominique's residence at approximately 5:45 p.m. following a 911 call from an identified victim who reported that the Defendant had brandished a firearm and threatened to use it. When the officers then found the Defendant, who matched the victim's description, in the back room of the residence given by the victim, they performed an initial frisk of Johnson and questioned him while other officers searched the second floor (based upon Dominique's misdirection) and then returned to question Dominique and Hill. At the same time, two officers left Dominique's residence to get more information from Deandrea about the altercation to confirm or dispel their suspicions and asked her whether she would sign a complaint.

While officers questioned Defendant, his inconsistent answers, including originally denying an altercation and providing a false name, raised the officer's

15

suspicion, which further prolonged the stop while officers attempted to confirm the sequence of events and verify the information Defendant provided.

In total, the officers' interaction with Johnson prior to finding the firearm lasted approximately fourteen minutes, during which time officers questioned Johnson, Dominique, Hill, and Deandrea at two separate residences. The Seventh Circuit has found significantly longer *Terry* stops constitutional where the officers acted reasonably and diligently. *See Reedy*, 989 F.3d at 553 (collecting cases).

Because the officers diligently pursued their investigation and detained Johnson no longer than necessary to confirm or dispel their suspicions regarding his involvement in criminal activity, the length of his *Terry* stop poses no constitutional threat.

### E. Inevitable Discovery

Finally, even if either of the officers' frisks of Johson had been unsupported by reasonable suspicion, the Court would still deny his motion based upon the factual record and the doctrine of inevitable discovery. If "the challenged evidence ultimately would have been discovered through lawful means without regard to the constitutional error, then the evidence is not subject to suppression." *United States v. Eymann*, 962 F.3d 273, 288 (7th Cir. 2020).

After the officers spoke with Deandrea, she signed a formal complaint. At the suppression hearing, Officer Riordan testified that, once Deandrea confirmed she would sign a complaint, the officers intended to arrest Johnson and that, pursuant

to their common practice and procedure, the officers would have performed a custodial search of Johnson, which would inevitably have led them to find the gun Deandrea said Defendant had brandished.

Indeed, based upon the totality of the circumstances, including a detailed report from an identified citizen-victim, this Court finds that the officers possessed probable cause to arrest the Defendant certainly the moment—if not far earlier—that they knew he matched both the description and location provided by the victim, and Defendant admitted "he got into it" with her (after initially denying it and providing a false identity).[4]

---

[4] *See, e.g., Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 680 (7th Cir. 2007) (holding that for probable cause an officer "may rely on information provided to him by the victim or by an eyewitness to the crime that the officer reasonably believes is telling the truth") (citing *Pasiewicz v. Lake Cty. Forest Preserve Dist.,* 270 F.3d 520, 524 (7th Cir. 2001) and *Gramenos v. Jewel Cos.,* 797 F.2d 432, 439 (7th Cir. 1986)); *Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir. 1991) (holding that "when an officer has 'received his information from some person—normally the putative victim or an eyewitness—who seems reasonable to believe is telling the truth,'" the officer "has probable cause") (quoting *Gramenos*, 797 F.2d at 439); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) ("So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause"); *Gerald M. v. Conneely,* 858 F.2d 378, 381 (7th 1988); *Jones v. City of Chi.*, 856 F.2d 985, 994 (7th Cir. 1988) (holding that identification given by a "lucid" victim would establish probable cause); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994); *Bates v. Stevenson*, No. 93 C 1815, 1996 WL 327811, at *4 (N.D. Ill. June 12, 1996) (holding that since information came from "an ordinary citizen, his identification of [offender] carries a presumption of reliability"); *Huffman v. Grinnell*, 880 F. Supp. 1194, 1198 (N.D. Ill. 1995) ("Information supplied by an ordinary citizen" to the police "carries a presumption of reliability."); *United States v. Barnett*, No. 17-CR-00676, 2023 WL 1928202, at *7 (N.D. Ill. Feb. 10, 2023) ("Unlike anonymous tipsters, identified victim-witnesses remain subject to criminal and civil penalties for making false reports to the police, and their accounts otherwise bring with them an intrinsic presumption of reliability in assessing probable cause."); *United States v. Cortez-Gomez*, 2023 WL 4405832, at *5 (N.D. Ill. July 7, 2023) ("Moreover, when officers rely upon testimonial evidence to help establish the existence of probable cause, the court will consider various factors to assess the source's reliability, including whether the source relayed first-hand or second-hand information, *United States v. Towns*, 913 F.2d 434, 440–41 (7th Cir. 1990); whether the source was an identified citizen or victim (who would be entitled to a presumption of reliability) or rather an anonymous source or confidential informant (requiring more caution in assessing credibility).").

As a result, this Court denies Defendant's motion, on the alternative grounds, that a lawful arrest and custodial search remains supported by the record and would have otherwise revealed the firearm.

### III. Conclusion

Consistent with the above findings of fact and conclusions of law, this Court denied Defendant's motion to suppress [46] via its prior ruling [78] (oral ruling made on June 6, 2024, and reflected in the minute order entered that same date).

Date: July 23, 2024

ENTERED:

John Robert Blakey
United States District Judge